IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § | MDL-1446 |
| | § | |
| MARK NEWBY, ET AL., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-01-3624 |
| | § | CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § | |
| | § | |
| Defendants | § | |
| VANGUARD BALANCED INDEX FUND, et al., | § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 03-5808 |
| | § | (COORDINATED) |
| CITIBANK, N.A., et al., | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

Pending before the Court in the above referenced cause, H-03-5808, is Citibank Defendants'[1] motion to dismiss Counts III through VII of the First Amended Complaint[2] (instrument #59) with prejudice pursuant to Fed. Rules of Civ. P. 12(b)(6)(failure to state a claim) and 12(b)(7)(failure to join indispensable parties), joined by Defendant Delta Energy Corporation ("Delta") (#64).

---

[1] Citibank Defendants are Citibank, N.A. and Citigroup Global Markets, Inc. (f/k/a Salomon Smith Barney, Inc.).

[2] The First Amended Complaint is docketed as #56.

As will be discussed, Plaintiffs the Vanguard Funds[3] have recently informed the Court that they have sold their Yosemite Notes and withdrawn Counts III, IV, VI, and part of VII; the Court will thus address the motion to dismiss as it relates to the remaining Count V and the first part of Count VII.

This action was originally filed on April 8, 2003 in the Court of Common Pleas, Chester County, Pennsylvania, was removed to the United States District Court for the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1334 and § 1452 based on "related to" [Enron] bankruptcy jurisdiction, and was subsequently transferred to the undersigned judge by the Judicial Panel on Multidistrict Litigation for pretrial participation in MDL-1446. The claims in this suit are grounded in Pennsylvania statutory and common law.

### Factual Allegations

Plaintiffs' complaint at ¶ 48 claims that a "complex financial and accounting fraud permeating virtually every aspect

---

[3] Plaintiffs are comprised of the following Vanguard Funds: Vanguard Balanced Index Fund, on behalf of its Vanguard Balanced Fund series; Vanguard Bond Index Funds, on behalf of its Vanguard Short-Term Bond Index Fund series and on behalf of its Vanguard Total Bond Market Index Fund series; Vanguard Fixed Income Securities Funds, on behalf of its Vanguard Intermediate-Term Investment-Grade Fund Series f/k/a Vanguard Intermediate-Term Corporate Fund series and on behalf of its Vanguard Short-Term Investment-Grade Fund series f/k/a Vanguard Short-Term Corporate Fund series; Vanguard Variable Insurance Fund, on behalf of its Vanguard Variable Insurance Fund--Short-Term Corporate Portfolio series and on behalf of its Vanguard Variable Insurance Fund--Total Bond Market Index Portfolio series; Vanguard Institutional Index Fund on behalf of its Vanguard Institutional Total Bond Market Index Fund series; and Vanguard Fiduciary Trust Company Corporate Bond Trust (collectively, the "Vanguard Funds").

of Enron's business . . .[f]rom at least as early as 1997, [was used to paint a] robust picture of [Enron's] health . . . to the investing public, government regulators, and the rating agencies." Moreover, "[t]his illusion was created and maintained through a highly structured web of transactions among Enron and a number of complicitous parties, including specifically, Defendants Citibank, Salomon Smith Barney, and Delta." *Id.* The complaint asserts that from 1997 on, "Enron increasingly relied upon and paid exorbitant fees" to Citibank "to help devise and implement schemes whose principal purpose and effect was to disguise Enron's cash flow and debt reporting problems from analysts and the investing public." Complaint at ¶ 74.  The instant action focuses on a part of the scheme using one particular investment vehicle, the Yosemite Trust, for which Citibank and Smith Barney solicited unsuspecting institutional investors to purchase Notes with money that was then used by Defendants to fund a sham transaction to manipulate Enron's reported financial information and to shift billions of dollars of Citibank's own Enron credit exposure to the investors, including Plaintiffs the Vanguard Funds.

Specifically the complaint asserts that on November 18, 1999 Salomon Smith Barney ("Smith Barney"), a newly acquired investment banking affiliate of Citibank, allegedly employing false and misleading statements in the Offering Memorandum,[4]

---

[4] Citibank Defendants have provided a copy of the Offering Memorandum as Ex. C to #61, Declaration of Jonathan H. Hurwitz in support of Defendants' motion to dismiss.

According to Plaintiffs' complaint at ¶¶ 136-39, the Yosemite Notes Offering Memorandum incorporated by reference

offered and sold Yosemite Securities Trust I 8.25% Series 1999-A Linked Enron Obligations due 2004 (the "Yosemite Notes"), of which Plaintiffs purchased $65,000,000 in the aggregate principal amount, and subsequently purchased an additional $5,695,000 worth. Another $75 million was received by the Trust from equity investors that were designated "Certificate Holders." Plaintiffs claim that the Offering Memorandum incorporated Enron's financial statements, which Citibank and Smith Barney knew were false because of Citibank's direct participation in material

---

Enron's financial statements included in its Form 10-K annual report for the year ending December 31, 1998, and Form 10Q quarterly reports for quarters ending March 31, 1999 and June 30, 1999, current reports on Form 8-K dated January 26, 1999 and March 18, 1999 and a description of Enron's capital stock as stated in the Registration Statement on Form 8-B, filed on July 2, 1997. It also incorporated by reference Enron's quarterly report on Form 10-Q for the quarter ending September 30, 1990 and filed with the SEC on November 15, 1999. The Offering Memorandum also disclosed "Enron's Historical Consolidated Financial Information" for the years 1996-98 and for the six months ending June 30, 1998 and June 30, 1999. According to the complaint, Citibank and Smith Barney, which had been involved in numerous fraudulent transactions (e.g., Roosevelt, Truman, and Jethro sham prepays, and sham minority interest transactions known as "Nighthawk" and "Rawhide) during this period, knew these documents contained material misstatements by Enron. *Id.* at ¶ 140. (In a legitimate minority interest transaction, a company holding a majority interest in a subsidiary sells a minority equity interest to a supposedly unrelated entity ("the minority shareholder"), which then bears the economic risk for that investment. In these minority interest transactions, however, the minority shareholders were allegedly not independent, borrowed most of their funds from Citibank, and were used to "cook" Enron's books and conceal Enron's debt.) Moreover, states the complaint, Citibank and Smith Barney have admitted that the financial statements included in Enron's Form 10-K annual report for the year ending December 31, 1998, Form 10-Q reports for quarters ending March 31, 1999, June 30, 1999, and September 30, 1999 "contained "materially false and misleading statements" and that Enron's financial statements for the years ending December 31, 1997-through December 31, 2000 "should not be relied upon." *Id.* at ¶¶ 142-44.

-4-

transactions, including (1) seemingly legitimate circular commodity trades with Enron called "prepays" that were actually loans in order to overstate Enron's cash flow and understate its debt and (2) minority interest transactions using special purpose entities (e.g., Nighthawk and Rawhide), deceptively appearing to be independent third-party entities that were used to disguise the nature of Enron's financial transactions. These transactions were utilized to misrepresent Enron's financial condition and creditworthiness and to deceive investors and rating agencies over the years. The complaint asserts, "If the proceeds of these sham prepay transactions had been properly reflected as debt on Enron's consolidated financial statements, the total mix of available information considered by purchasers of the Yosemite Notes, including the Vanguard Funds, would have been significantly altered." #56 at ¶ 171.

The Amended Complaint (#56 at ¶ 125) describes the structure of the Yosemite scheme devised by Citibank and Smith Barney as follows:

> a. The parties established a Delaware business trust called "Yosemite."
> b. The Trust documents established Citibank as the Trust's "Directing Party,"[5] and

---

[5] Wilmington Trust Company was named as Trustee, but its role was "largely an administrative function. The business of the Trust was actually conducted by the 'Directing Party,' which was empowered, among other things, to direct the investment of the Trust's assets. Citibank was the Directing Party for the Yosemite Trust." #56 at 37 n.22. As "Directing Party," Citibank "was vested with exclusive authority to transfer the Trust's assets and incur obligations on the Trust's behalf," which it exercised in the alleged fraudulent transfers at issue in this suit. Complaint at ¶ 310. According to Plaintiffs, Citibank knew that Enron's

empowered Citibank to invest the Trust assets in "Trust Investments" . . .

c.     Through    an    elaborate    series    of transactions, Citigroup and Enron acquired beneficial ownership in an equal equity share of the Yosemite Trust.

d.     Yosemite Trust also raised capital by issuing Enron credit-linked notes and selling the    notes    to    qualified    institutional investors, including the Vanguard Funds.

e.  Finally, the Trust entered into a swap arrangement   with   Citibank.      The   swap arrangement provided that Citibank would receive   the   cash   flow   from   the   Trust Investments in exchange for paying the Trust an amount equal to the interest amounts due on    the    Notes    and    the    yield    on    the Certificates.    Thus, in essence, Citibank guaranteed the interest payments on the Notes and the yield on the Certificates--but only in the absence of an Enron credit event.  If Enron declared bankruptcy (or certain other enumerated   negative   Enron   credit   events occurred), then Citibank had the right to swap the Trust Investments for a less than comparable amount of senior unsecured Enron debt.

According to the complaint at ¶¶ 12-13, Citibank, Smith Barney, and Enron designed Yosemite Trust to allow Citibank to retain total control over the funds raised through the fraudulent offering of the Yosemite Notes.  A "black box" feature barred investors and credit rating agencies from learning how Citibank used the proceeds of the offering.[6]  Citibank immediately invested nearly all of the Yosemite Trust's assets into a new prepay,

---

obligations were worth far less than the money it caused the Trust to pay for them.

[6] The offering documents stated that unless a default on the Notes occurred, "the Trust will not disclose to the Noteholders information relating to the Trust Investments held by it at anytime."  #56 at ¶ 127.

circular transaction (i.e., loan) involving Delta[7] and Enron.
Citibank caused the Trust to invest the rest of the Trust's cash
in overpriced direct obligations of Enron. In turn, Enron used
these assets to satisfy outstanding debt that it owed to Citibank.
*See* #56 at ¶¶ 247-78 for detailed explanation. Thus Citibank and
Smith Barney used the Notes offering to off-load Citibank's
overpriced Enron credit exposure to unsuspecting investors,
including Plaintiffs, while Citibank and Smith Barney pocketed
substantial fees for structuring and marketing these Yosemite
transactions. When Enron finally declared bankruptcy in December
2001, Citibank caused the Trust to transfer substantially all its
assets to Citibank in exchange for defaulted Enron Deliverable
Obligations of less than reasonably equivalent value. The result
of these fraudulent transfers was an insolvent Yosemite Trust,
which then defaulted on the Yosemite Notes sold to investors,
including Plaintiffs, and the unjust enrichment of Citibank. Thus
the Yosemite scheme provided Enron with access to more phony

---

[7] The complaint describes Delta as "a 'special purpose entity'
formed by Citibank under the laws of the Cayman islands for the
purpose of facilitating 'prepaid' transactions structured by
Citibank for the benefit of Enron." It was financed and controlled
by Citibank. ¶¶ 40, 88. According to the complaint, although
Delta was designed to appear to be a legally distinct entity from
Citibank it was not; the complaint accuses Citibank of being
Delta's alter ego: "[i]n other words, Citibank controlled Delta and
used Delta as a mere instrumentality and agent" for transactions
described in the complaint to mislead analysts and investors. ¶¶
83 and 42. The U.S. Senate Subcommittee on Investigations found
that "Delta was at all times a mere instrumentality of Citibank"
and that "Citibank exercised complete dominion and control over
Delta and ignored any corporate formalities in its relationship
with Delta." ¶ 84. Enron Bankruptcy Examiner Neal Batson made
similar findings. ¶ 86. See also ¶ 87 (facts disclosed in
deposition testimony demonstrating Citibank's control of Delta).

prepay cash flows, allowed Citibank to dump a substantial amount of its own Enron credit exposure onto investors at artificially inflated prices, and generated significant investment banking fees for Smith Barney.   #56 at ¶ 129.

## II.  Causes of Action

In the First Amended Complaint Plaintiffs asserted seven causes of action:  (1) against Defendant Smith Barney for primary violations of the Pennsylvania Securities Act of 1972 as the "seller" of the Yosemite Notes to the Vanguard Plaintiffs, 70 P.S. §1-501(a) (Purdons 2004)[8]; (2) against Defendant Citibank for secondary violations of the Pennsylvania Securities Act, 70 P.S. § 1-503(a),[9] as an "affiliate" aiding primary violator Smith

---

[8] Section 1-501(a) provides in relevant part,

Any person who:  (I) offers or sells a security in violation of 407(c) or at any time when such person has committed a material violation of section 301, or any regulations relating to either section 301 or 407(c), or any order under this act of which he has notice; or (ii) offers or sells a security in violation of sections 401, 403, 404 or otherwise by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the purchaser not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission, shall be liable to the person purchasing the security from him . . . .

[9] Section 1-503(a) recites,

Every affiliate of a person liable under section 501 or 502, every partner, principal

-8-

Barney in offering and selling the Yosemite Notes to the Vanguard
Plaintiffs by material misrepresentations and omissions; (3)
against Defendants Citibank and Delta for intentional fraudulent
transfers[10] from the Yosemite Trust under the Pennsylvania Uniform
Fraudulent Transfer Act ("Pa. UFTA"), 12 Pa. C.S.A. §§ 5104

---

> executive officer or director of such person,
> every person occupying a similar status or
> performing similar functions, every employe[e]
> of such person who materially aids in the act
> or transaction constituting the violation, and
> every broker-dealer or agent who materially
> aids in the act or transaction constituting
> the violation, are also liable jointly and
> severally with and to the same extent as such
> person, unless the person liable hereunder
> proves that he did not know, and in the
> exercise of reasonable care could not have
> known, of the existence of the facts by reason
> of which the liability is alleged to exist.

Section 1-102(b) states, "An 'affiliate' of, or a person
'affiliated' with, a specified person, means a person that
directly, or indirectly through one or more intermediaries,
controls, is controlled by, or is under common control with, the
person specified."

The Yosemite Notes Offering Memorandum defines an
"affiliate" as "any person that directly or indirectly through one
or more intermediaries, controls such person or is under direct or
indirect common control with such person. As used herein, the term
'control' means possession, directly or indirectly, of the power to
direct or cause the direction of the management or policies of a
person, whether through the ownership of voting securities, by
contract, or otherwise."  #56 at ¶ 302.

---

[10] The fraudulent transfers at issue are the Trust's initial
purchase of the $800 million "Delta" and $25 million "Magic" notes
(the proceeds of which were funneled to Enron through a sham prepay
transaction and Enron then used most of it to retire two
preexisting sham Citibank prepays, i.e., Roosevelt and Jethro) and
the swap agreement the Trust entered into with Citibank (Citibank
would receive cash flow from the Trust investments in return for
paying the Trust an amount equal to the interest amounts due on the
notes and the yield on the Certificates, but in the event Enron
declared bankruptcy, Citibank could (and did) swap the Trust
investments for a lesser amount of senior unsecured Enron debt).

( F r a u d u l e n t   T r a n s f e r s ) , [11]    5 1 0 7

-------

[11] The Pa. UFTA applies to transfers made after February 1, 1994.  It "sets forth circumstances under which certain transfers or obligations incurred by a debtor may be deemed to be fraudulent.  When those circumstances are satisfied, the statute allows a creditor to avoid the transfer or obligation." *K-B Building Co. v. Sheesley Construction, Inc.*, 833 A.2d 1132, 1135 (Pa. Super. Ct. 2003).

Section 5104 provides,

> **(a)  General rule.**--A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (1) with an actual intent to hinder, delay or defraud any creditor of the debtor; or
>>
>> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor:
>>
>>> (I) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due.
>
> **(b)  Certain factors.**--In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:
>
>> (1) the transfer or obligation was to an insider;
>>
>> (2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was
disclosed or concealed;

(4) before the transfer was made or
obligation was incurred, the debtor
had been sued or threatened with
suit;

(5) the transfer was of
substantially all the debtor's
assets;

(6) the debtor absconded;

(7) the debtor removed or concealed
assets;

(8) the value of the consideration
received by the debtor was
reasonably equivalent to the value
of the asset transferred or the
amount of the obligation incurred;

(9) the debtor was insolvent or
became insolvent shortly after the
transfer was made or the obligation
was incurred;

(10) the transfer occurred shortly
before or shortly after a
substantial debt was incurred; and

(11) the debtor transferred the
essential assets of the business to
a lienor who transferred the assets
to an insider of the debtor.

Section 5104(a)(1) addresses liability under an "actual intent"
theory of fraud, while (2)(2) deals with "constructive fraud," as
in the case where the debtor became insolvent at the time of the
transfer or as a result of the transfer and did not receive
reasonably equivalent value in exchange for the transfer. *TIAB
Communications Corp. v. Keymarket of NEPA, Inc.*, 263 F. Supp.2d
925, 934 (M.D. Pa. 2003), *citing In re Blatstein*, 192 F.3d 88, 96
(3d Cir. 1999). Plaintiffs need not proved that the debtor
intended to defraud a specific creditor; intent to defraud any
creditor is sufficient. *Id.* at 934-35, *citing Blatstein* at 97.
Moreover, the existence of fraudulent intent may be inferred from
all facts and circumstances surrounding the conveyance. *Id.* at
934. The plaintiff does not have to show that all factors listed

-11-

(Remedies of Creditors, including "[a]voidance of the transfer or
obligation to the extent necessary to satisfy the creditor's
claim"), and 5108 (Defenses, liability and protection of
transferee)[12]; (4) against Citibank and Delta for constructive
fraudulent transfer under §§ 5104, 5105,[13] 5107 and 5108 of Pa.
UFTA; (5) against Citibank for unjust enrichment when Enron used
the proceeds of the transaction to pay down previous debt to
Citibank[14]; (6) against Citibank for liability as the

---

in the statute evidence fraudulent intent, and the defendant may
also have other motivation besides fraud for the transfer. *Id.* at
935-36.

[12] Section 5108(b) authorizes judgment for voidable transfers
to be entered against

> (1) the first transferee of the asset or the
> person for whose benefit the transfer was
> made; or
>
> (2) any subsequent transferee other than a
> good faith transferee who took for value or
> from any subsequent transferee.

[13] Section 1505 states,

> A transfer made or obligation occurred by a
> debtor is fraudulent as to a creditor whose
> claim arose before the transfer was made or
> the obligation incurred if the debtor made the
> transfer or incurred the obligation without
> receiving a reasonably equivalent value in
> exchange for the transfer or obligation and
> the debtor was insolvent at that time or the
> debtor became insolvent as the result of the
> transfer or obligation.

[14] Under Pennsylvania law,

> A quasi-contract imposes a duty, not as a
> result of any agreement, whether express or
> implied, but in spite of the absence of an
> agreement, when one party receives unjust
> enrichment at the expense of another.  In

-12-

> determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched. the elements of unjust enrichment are 'benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.' The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff. Where unjust enrichment is found, the law implies a quasi-contract which requires the defendant to pay to plaintiff the value of the benefit conferred. In other words, the defendant makes restitution to the plaintiff in *quantum meruit*.

*Commerce Bank/Pennsylvania v. First Union National Bank*, 2006 Pa. Super. 305, ____, 911 A.2d 133, 143-44 (Pa. Super. 2006), *quoting Lakner v. Glosser*, 892 A.2d 21, 31-32 (Pa. Super. 2006). "The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched." *Limbach Co., LLC v. City of Philadelphia*, 905 A.2d 567, 575 (Pa. Cmwlth. 2006), *citing Mitchell v, Moore*, 729 A.2d 1200, 1203-04 (Pa. Super. 1999). "'To sustain a claim of unjust enrichment, a claimant must show that the party against whom recover is sought either 'wrongfully secured or passively received a benefit that would be unconscionable for her to retain.''" *Id. quoting Torchia v, Torchia*, 346 Pa. Super. 229, 499 A.2d 581, 582 (1985).

A constructive trust is "a relationship with respect to property subjecting the person by whom the title to property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property." *Kern v. Kern*, 892 A.2d 1, 8-9 (Pa. Super. 2005), *appeal denied*, 588 Pa. 765, 903 A.2d 1234 (Pa. 2006). Constructive trusts have been imposed where a party acquires legal title to property by violating some express or implied duty owed to another. *Koffman v. Smith*, 453 Pa. Super. 15, 32, 682 A.2d 1282, 1291 (1996). If unjust enrichment is established, an equitable remedy is imposition of a constructive trust. *DeMarchis v. D'Amico*, 432 Pa. Super. 152, 166, 637 A.2d 1029, 1036 (1994)(the equitable

-13-

alter ego of the Yosemite Trust based on various transfers of
funds from the Trust; and (7) against Smith Barney, Citibank, and
Delta for participating in a civil conspiracy[15] (a) to violate the
Pennsylvania Securities Act, 70 P.S. § 1-401(b),[16] by issuing,

---

remedy of constructive trust is applied "when a person holding
title to property is subject to an equitable duty to convey it to
another on the ground he would be unjustly enriched if he were
permitted to retain it."). There is no set standard for
determining what kinds of facts must be proven for imposition of a
constructive trust; "the test is merely whether unjust enrichment
can be avoided." *Koffman v. Smith*, 453 Pa. Super. 15, 32, 682 A.2d
1282, 1291 (1996); *see also Hercules v. Jones*, 415 Pa. Super. 449,
458, 609 A.2d 837, 841 (1992). "Generally, an equitable duty to
convey property arises only in the presence of fraud, duress, undue
influence, mistake or abuse of a confidential relationship"; "where
a person acquires property by fraud or otherwise under such
circumstances he holds it upon a constructive trust for the
transferor, and the transferee transfers the property to a person
who is not a bona fide purchaser, the latter holds the property
upon a constructive trust for the person equitably entitled to it."
*Koffman,* 682 A.2d at 1291. There need not be a fiduciary
relationship in order to impose a constructive trust. *Id*.

[15] To sustain a cause of action for civil conspiracy under
Pennsylvania law, a plaintiff must show "'that two or more persons
combined or agreed with intent to do an unlawful act or to do an
otherwise lawful act by unlawful means. Proof of malice, i.e., an
intent to injure, is essential in proof of a conspiracy.'"
*Commerce Bank/Pennsylvania*, 911 A.2d at 143, *quoting Thompson Coal
Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979).

[16] Section 1-401 provides,

> It is unlawful for any person, in connection
> with the offer, sale or purchase of any
> security in this State, directly or
> indirectly:
>
> (a) to employ any device, scheme or artifice
> to defraud;
>
> (b) To make any untrue statement of a material
> fact or to omit to state a material fact
> necessary in order to make the statements
> made, in light of the circumstances under
> which they are made, not misleading; or

offering, and selling the Yosemite Notes to the Vanguard Plaintiffs by means of material untrue statements and omissions of fact in the Offering Memorandum and (b) to commit fraudulent transfers in violation of the Pennsylvania Uniform Fraudulent Transfer Act ("Pa. UFTA"), 12 Pa. C.S.A. §§ 5101, *et seq.*[17]

On February 11, 2008, counsel for the Vanguard Plaintiffs filed an Update to the Court Mooting Certain Portions of the Citibank Defendants' Motion to Dismiss (#74). It reported that on April 10, 2007 the Vanguard Plaintiffs disposed of their Yosemite Notes holdings, and they have discussed the impact of the sale on this action with Citibank Defendants and Delta. The parties agree that the Vanguard Plaintiffs should withdraw Counts III, IV, VI, and that portion of Count VII that relates to Defendants' alleged conspiracy to commit fraudulent transfers. The still viable portion of Count VII, relating to Defendants' alleged participation in a conspiracy to violate the Pennsylvania Securities Act, is unaffected by the sale of the Vanguard Plaintiffs' Notes; moreover Citibank Defendants' motion to dismiss does not address it, so it remains pending even if the motion is granted. Thus Plaintiffs and Defendants agree that Citibank Defendants' motion to dismiss, joined by Delta, is moot as to

---

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

[17] Count 7(a) is still viable; 7(b) is withdrawn. Nevertheless, because part of Citibank Defendants' alleged fraud on Plaintiffs is Defendants' fraudulent transfers, the factual allegations support Plaintiffs' claim for unjust enrichment and constructive trust.

Counts III, IV, VI and VII, and remains pending only as to Count V for unjust enrichment.

Plaintiffs have also now filed a Motion for Suggestion of Remand (#75) of this action to the United States District Court for the Southern District of Pennsylvania and request that the Court grant it.  Alternatively, if the Court chooses to consider the remaining portion of Citibank Defendants' motion to dismiss, they ask for a swift resolution of it, followed by a suggestion of remand.

The Court chooses to resolve the remaining issues in the motion to dismiss.

### III.  Standard of Review

**A.  Rule 12(b)(6)**

Dismissal under Rule 12(b)(6) is disfavored, and a motion to dismiss under the rule is rarely granted.  *Lowrey v. Texas A&M University System*, 117 F.3d 242, 247 (5th Cir. 1997). The court must construe the complaint liberally in favor of the plaintiff and all well pleaded facts must be taken as true and any doubts regarding the sufficiency of the claim must be resolved in favor of the plaintiff.  *Id.; Jones v. Alcoa, Inc.*, 339 F.3d 359, 362 (5th Cir. 2003).  Nevertheless conclusory allegations and unwarranted factual deductions will not suffice to avoid a motion to dismiss.  *United States ex rel. Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 379 (5th Cir. 2003).

Under Fed. R. Civ. P. 10(c), "a copy of any written instrument which is an exhibit to a pleading is a part thereof for

all purposes." Thus documents attached to a complaint are viewed as part of the plaintiff's pleadings. *General Electric Capital Corp. v. Posey*, 415 F.3d 391, 398 n.8 (5th Cir. 2005), *citing inter alia* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1327, at 766 (1990)("[A] plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment.").

Furthermore any documents attached by a defendant to its motion to dismiss that are referred to in the plaintiff's complaint are also considered part of the pleadings. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). *See also Ferrer v. Chevron Corporation*, 484 F.3d 776, 780 n.13 (5th Cir. 2007), *quoting Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003)("[T]he court may review the documents attached to the motion to dismiss . . . where the complaint refers to the documents and they are central to the claim.").

Traditionally, dismissal was not proper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lowrey,* 117 F.3d at 247, *citing Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In a recent antitrust case, however, the Supreme Court appears to have modified the *Conley* rule by inserting a new "plausibility standard." *Bell Atlantic Corporation v. Twombley*, 127 S. Ct. 1955 (2007)(7-2). In *Bell Atlantic*, the Supreme Court pronounced that the *Conley* "'no set of facts' language" test "has earned its retirement" and "is best forgotten." *Bell Atlantic*,

-17-

127 S. Ct. at 1969, opined that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions and a formulaic recitation of the elements of a cause of action will not do . . . ." 127 S. Ct. at 1964-65.[18]  "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, at 235-36 (3d ed. 2004).  The Federal Rules "have not dispensed with the pleading of facts altogether," but "for most types of cases . . . [have] eliminated the cumbersome requirement that a claimant 'set out *in detail* the facts upon which he bases his claim.'"  *Id.* at 1265 n.3, *citing Conley*, 355 U.S. at 47. Nevertheless "some factual allegation" is necessary to "satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Id.*, *citing* 5 Wright & Miller § 1202 at 94, 95 ("Rule 8(a) 'contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented' and does not authorize a pleader's 'bare averment that he wants relief and is entitled to it").  In reviewing *Conley*, the Supreme Court concluded,

> [O]nce a claim has been stated adequately, it may be supported by any set of facts consistent with the allegations in the

---

[18] The majority in *Bell Atlantic* opined that the rule in *Conley v. Gibson,* 355 U.S. at 45-46 ("a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief") had been widely misunderstood and "is best forgotten as an incomplete negative gloss on an accepted pleading standard . . . ."

> complaint. *Conley*, then, described the
> breadth of opportunity to prove what an
> adequate complaint claims, not the minimum
> standard of adequate pleading to govern a
> complaint's survival.

127 S. Ct. at 1969.

## B.  Rules 12(b)(7) and Rule 19

Rule 12(b)(7) permits dismissal for "failure to join a party under Rule 19."

Rule 19 addresses required joinder of all parties whose presence is necessary for the fair and complete resolution of the dispute in a lawsuit and, if those parties cannot be joined, for dismissal of the action. *HS Resources, Inc. v. Wingate*, 327 F.3d 432, 438 (5th Cir. 2003).

Rule 19(a), "Persons Required to Be Joined if Feasible,"[19] provides in relevant part,

> (1) Required Party.  A person who is subject
> to service of process and whose joinder will
> not deprive the court of subject-matter
> jurisdiction must be joined as a party if:
>
>   (A) in the person's absence, the court
> cannot accord complete relief among existing
> parties, or
>
>   (B) that person claims an interest relating
> to the subject of the action and is so
> situated that the disposing of the action in
> the person's absence may
>
>     (i) as a practical matter impair or
>     impede the person's ability to
>     protect that interest; or
>
>     (ii) leave an existing party
>     subject to a substantial risk of

---

[19] Amended Rule (changes intend to be stylistic only), effective as of December 1, 2007.

-19-

> incurring double, multiple, or
> otherwise inconsistent
> obligations[20] because of the
> interest.
>
> (2) Joinder by Court Order. If a person has
> not been joined as required, the court must
> order that person to be made a party. A
> person who refuses to join as a plaintiff may
> be made either a defendant or, in the proper
> case, an involuntary plaintiff. . . .

Federal Rule of Civ. P. 19(b), entitled "When Joinder

is Not Feasible," states,

> If a person who is required to be joined if
> feasible cannot be joined, the court must
> determine whether, in equity and good
> conscience, the action should proceed among
> the existing parties or should be dismissed.
> The factors for the court to consider
> include:
>
> (1) the extent to which a judgment rendered
> in the person's absence might prejudice that
> person or the existing parties;
>
> (2) the extent to which any prejudice could
> be lessened or avoided by:
>
>> (A) protective provisions in the
>> judgment;
>> (B) shaping the relief;
>> (c) other measures;
>
> (3) whether a judgment rendered in the
> person's absence would be adequate; and
>
> (4) whether the plaintiff would have adequate
> remedy if the action were dismissed for
> nonjoinder.

---

[20] The Fifth Circuit has explained that the meaning of the word "obligation" is not limited to multiple and repetitive litigation, but is "intended to prevent 'a double or otherwise inconsistent liability,'" like having to pay twice for the same alleged misconduct, causing the same harm," where there are parallel suits, one individual and one derivative, and a plaintiff could recover in both. *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1311-12 (5th Cir. 1986).

The four factors listed in Rule 19(b)

> may be delineated as the interests that
> affect four categories of persons: the
> plaintiff, the defendant, the absentees and
> the public. First to be considered is the
> plaintiff's interest in a federal forum,
> second, the defendant's interest in avoiding
> "multiple litigation, or inconsistent relief,
> or sole responsibility for a liability he
> shares with another," third, the absentees'
> interest in avoiding prejudice from the
> proceeding, and fourth, the interest of the
> courts and the public in complete, consistent
> and efficient settlement of controversies.

*Pulitzer*, 784 F.2d at 1312, *citing Provident Tradesmen's Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109-11 (1968).

Thus a Rule 12(b)(7) analysis under Rule 19 involves two steps: (1) the court must determine under Rule 19(a) whether the party should be joined and, if so, (2) if the joinder would destroy the court's jurisdiction or the party cannot be joined for some other reason, under 19(b) whether to proceed without that party or whether to dismiss the suit because consideration of the four factors leads to the conclusion that the person is actually "indispensable." *H.S. Resources*, 327 F.3d at 439; *Tick v. Cohen*, 787 F.2d 1490, 1494 (11th Cir. 1986).

In *Provident Tradesmens*, the United States Supreme Court wrote,

> The decision whether to dismiss (i.e., the
> decision whether the person missing is
> 'indispensable') must be based on factors
> varying with the different cases, some such
> factors being substantive, some procedural,
> some compelling by themselves, and some
> subject to balancing against opposing
> interests. Rule 19 does not prevent
> assertion of compelling substantive
> interests; it merely commands the courts to

-21-

> examine each controversy to make certain that
> the interests really exist.  To say that a
> court 'must' dismiss in the absence of an
> indispensable party and that it 'cannot
> proceed' without him puts the matter the
> wrong way around:  a court does not know
> whether a particular person is
> 'indispensable' until it had examined the
> situation to determine whether it can proceed
> without him.

390 U.S. at 118-19.

> The Fifth Circuit has opined,

> The 1966 amendments to Rule 19 militate in
> favor of a highly practical, fact-based
> decision.  This emphasis constitutes a clear
> break from the often technical pre-1966
> rulings under Rule 19 that commonly relied on
> fine legal distinctions between types of
> interest, distinctions that were not
> concerned with the question whether all the
> parties in interest had been joined.  The new
> emphasis on pragmatism meant that courts
> could now freely consider various harms that
> the parties and absentees might suffer.

*Pulitzer*, 784 F.2d at 1309 (5th Cir. 1986).  It further noted, "The

very nature of the intensely factual inquiry called for by Rule

19 precludes establishment of any bright-line rule." *Id.* at 1313.

*See also Moreau v. Oppenheim*, 663 F.2d 1300, 1309-10 (5th Cir.

1981)("Under the flexible federal joinder rules, 'pragmatic

concerns rather than conclusory labels now control.' . . . Cases

under Rule 19 stress the equities of a particular case, not

conclusory classifications of property rights.  Rule 19 permits

courts to retain jurisdiction 'where the interests of substantial

justice require it.'" [citations omitted]), *cert. denied*, 458 U.S.

1107 (1982).

-22-

Initially for Rule 19(a), the burden of proof is on the party raising the defense to show that the person who was not joined is needed for a just adjudication.  7 Charles Alan Wright, *et al., Federal Practice and Procedure* § 1609 (3d ed. 2001).  In the Fifth Circuit, if, on an initial review of the facts, the court finds that there is potentially an indispensable party, the burden of disputing this possibility falls on the party opposing joinder.  *Pulitzer,* 784 F.2d at 1309.  *See also* 7 Charles Alan Wright, *et al., Federal Practice and Procedure* § 1609 (burden is on party raising the defense to show that the unjoined party is needed for a just adjudication; if it succeeds, burden shifts to the non-moving party to negate the indispensability of an unjoined party.)

The Eleventh Circuit has pointed to a distinction between joint obligors and joint obligees with respect to Rule 19.  *Brackin Tie Lumber and Chip Co. v. McLarty Farms, Inc.*, 704 F.2d 585, 586 (11th Cir. 1983).  "In Black's Law Dictionary, an obligee is defined as 'the person in favor of whom some obligation is contracted,' whereas an obligor is defined as the 'person who has engaged to perform some obligation.'"  *Id., citing* Black's Law Dictionary 1226 (4th ed. 1968).  Unlike joint obligors, which the majority of courts have held are not indispensable parties, joint obligees generally are viewed as indispensable parties.  *Id.* at 586-87 (and cases cited therein); *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 408 (3d Cir. 1993)(and cases cited therein)("Joint obligees . . . usually have been held

indispensable parties and their nonjoinder has led to a dismissal of the action."); 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1613 (3d ed. 2001)("Joint obligees . . . usually have been held indispensable parties and their nonjoinder has led to a dismissal of the action. Courts taking this position generally nave reasoned that the duty or promise was made to the obligees jointly, not separately, and that mandatory joinder is justified. Since it typically is in the interest of the obligees to join in enforcement of their common right, this requirement does not impose any hardship, especially in light of the court's power to join an absent person as an involuntary plaintiff. Revised Rule 19 does give the court flexibility to allow an action to go forward without a joint obligee when no prejudice would result either to the parties or the absentee and effective relief can be granted." [footnotes omitted]). *See also Harrell and Sumner Contracting Co. v. Peabody Petersen Co.*, 546 F.2d 1227, 1228-29 (5th Cir. 1977)(observing, in context of a partnership contract, general rule is that joint obligees are indispensable parties in an action for the enforcement of the obligation).

Beneficiaries of a trust in an action to restore trust assets are joint obligees. *Tick v. Cohen*, 787 F.2d 1490, 1494 (11th Cir. 1986)("As a general rule, all beneficiaries are persons needed for just adjudication of an action to remove trustees and require an accounting or restoration of trust assets); *Walsh v. Centeio*, 692 F.2d 1239, 1243 (9th Cir. 1986)("As a general rule,

-24-

beneficiaries are persons needed for just adjudication of an action to remove trustees and require an accounting or restoration of trust assets."); *Mathies v. Seymour Mfg. Co.*, 270 F.2d 365, 370 (2d Cir. 1959)(law "requires all the beneficiaries of a trust to be joined in an action by any one of them against the trustees to restore the corpus of the trust.").

Nevertheless the Fifth Circuit has concluded that such a *per se* approach

> relates more to the form of Rule 19 before it
> was amended in 1966. The amendment, however,
> greatly revised the rule "to eliminate
> formalistic labels that restricted many
> courts from an examination of the practical
> factors of an individual case." 7 Wright &
> Miller, Federal Practice & Procedure § 1601
> (1972)(quoting Cohen, The New Federal Rules
> of Civil Procedure, 54 Geo. L. J. 1204, 1206
> (1966)). Under the present rule, pragmatic
> concerns, especially the effect on the
> parties and on litigation, control a court's
> decision on joinder. See *Broussard v.
> Columbia Gulf Transmission Co.*, 398 F.2d 885,
> 999 (5th Cir. 1968)[, and *Provident
> Tradesmens*, 390 U.S. at 936].

*Smith v. State Farm Fire and Casualty Co.*, 633 F.2d 401, 405 (5th Cir. 1980)(holding that failure to join trustee in the bankruptcy of an owner of a life estate in a property destroyed by fire had no legal effect on those joint obligees of the insurance proceeds who were already parties because trustee could protect his interest in the life estate of a property, the trustee was aware of the litigation but did not try to be made a party, and State Farm's obligation was limited to the amount specified in the

insurance company so it was not subject to a substantial risk of incurring double liability for the value of the life estate).[21]

The Fifth Circuit, among other courts, has considered, as an equitable factor mitigating against the necessity of joining a party, the refusal or failure of the absent party to intervene after receiving notice of the litigation. *Burger King Corp. v. American National Bank and Trust Co. of Chicago*, 119 F.R.D. 672, 678 (N.D. Ill. 1988)("They reason that an absent person's decision to forego intervention indicates that he does not deem his own interests substantially threatened by the litigation; and if he does not, the court should not, absent special circumstances, second-guess this decision."), *citing United States v. Sabine Shell, Inc.*, 674 F.2d 480, 482-83 (5th Cir. 1982)("Equitable considerations govern the disposition of a litigant's argument that someone is an indispensable party. . . . [T]he property

---

[21] The appellate court opined,

> The absence of the trustee in no legal way affects the according of complete relief to those already parties. Neither is the trustee's ability to protect his interest in the life estate significantly impaired. It is clear from the record that the trustee was aware of this litigation yet did not attempt to be made a party. He instead secured an order of the bankruptcy court requiring Gladys Smith to pay the trustee the value of the life estate from any proceeds of this action. The fact that the trustee was wiling to rely on the efforts of Gladys, together with the fact that State Farm's obligation is limited to that specified under the contract of insurance, strongly suggest that State Farm is not subject to a "substantial risk" of incurring double liability for the value of the life estate. . . .

-26-

owners themselves, patently aware of this litigation, never intervened either at the district court or appellate court level. Presumably the property owners do not believe that the disposition of this suit will 'impair or impede' their ability to protect their interests."), and 3A *Moore's Federal Practice* ¶ 19.07[2.1] at 19-104-106.  Similarly the failure of existing parties to the suit to raise the issue of joinder before appeal militates against a finding in their favor.  *Sabine Shell*, 674 F.2d at 483.

Nevertheless bondholders/noteholders are a distinguishable type of trust beneficiary.  Bondholders/ Noteholders obtain their rights from a contract, known as an indenture, which sets out a system of individual rights held separately by individual noteholders and of collective rights held by the group of noteholders or their representative, i.e., the indenture trustee.  *See generally* Marcel Kahan, *Rethinking Corporate Bonds:  The Trade-Off Between Individual and Collective Rights*, 77 New York University Law Review  1040, 1041-43 (Oct. 2002).[22]  Many claims can only be brought by the trustee or the

_____

[22] As explained by Kahan, 77 New York University Law Review at 1063-64,

> The term "trustee" evokes strictly enforced fiduciary duties.  But an indenture trustee for a corporate bond has quite a different status and serves different functions than, say, a trustee in a traditional trust.  Until the Event of Default occurs, the trustee has virtually no obligations towards the bondholders (though it performs administrative tasks for the [issuer] company, such as mailing notices or selecting bonds for redemption).  Most importantly, the trustee has no obligation to give a "notice of

bondholders/noteholders as a group.  *Id.* at 1043.  Generally the indenture must follow the requirements in the Trust Indenture Act, which *inter alia* calls for the appointment of a trustee as the

---

default" to the company, which could cause the default to ripen into an Event of Default, has no affirmative duty to determine whether a default has occurred. . . . Once an Event of Default has occurred, the trustee's duties increase. Specifically, the trustee must comply with a "prudent person" standard (though the trustee is protected against any "error of judgment made in good faith" unless the trustee was negligent in ascertaining the pertinent facts.

The trustee typically receives a modest annual fee for its services. The trustee also is entitled to be reimbursed for its "reasonable" out-of-pocket expenses . . . . The Trustee, however, receives no extra compensation for its own efforts if its duties increase as a result of an Event of Default.

The structure of the trusteeship . . . creates few incentives for the trustee to act as an effective representative of the bondholders. The trustee has no direct monetary stake in preserving the value of the bonds, and neither the trustee's compensations structure nor its pre-Event of Default duties creates any incentives to do so. Prior to an Event of Default, the trustee's basic incentive is to do nothing, as taking any action entails effort for which the trustee is not compensated. To be sure, after an Event of Default, the liability regime creates incentives to satisfy the "prudent person" standard. It is, however, doubtful whether the fear of liability alone is sufficient to induce the trustee to take optimal actions to represent bondholder interests. Moreover, the heightened post-Event of Default duties create incentives for the trustee to refrain from any action that could trigger an event of Default, such as investigation suspicions of a default or giving a notice of default to the company. [Footnotes omitted]

representative of the bondholders/noteholders.[23] Although many
aspects of bondholder/noteholder rights and modification of and
enforcement of these rights are open to contracting, they tend to
be highly standardized. *Id.* at 1044, 1047. The most important
substantive right of bondholders and noteholders is the right to
receive payment of interest at designated intervals and payment
of principal when the bonds mature. *Id.* at 1045.

At issue here is whether the Vanguard Plaintiffs are
seeking to restore the assets of the Trust or whether they are
seeking repayment of interest and principal under their own Notes.
For purposes of the claims in the instant action, which focuses
on enforcement, under the Indenture and the Yosemite Notes, of the
Yosemite Noteholders' rights following the Event of Default,[24] also
at issue is the related question of whether the no-action clause
bars the Vanguard Plaintiffs from pursuing their claims because

---

[23] 15 U.S.C. § 77jjj.

[24] A "default" is not the same as an "Event of Default":

> A "default basically includes any breach of a
> provision in the indenture. A breach of the
> indenture other than a payment default
> generally becomes an "Event of Default" only
> if either the trustee or holders of 25% of the
> bonds give a "Notice of Default" to the
> company and the company fails to cure the
> default within a specified time period.

Kahan, 77 New York University Law Review at 1049. When an Event of
Default occurs, usually two types of remedies are provided for in
the indenture: (1) the bonds can be accelerated and the principal
and any accrued interest become immediately payable; or (2) any
other remedy to collect payment of interest and principal or to
enforce performance of any provision in the indenture may be
pursued. *Id.*

(1) they failed to satisfy the procedural requirements for bringing suit and (2) the no-action clause relegates the enforcement of their claims to the Yosemite Noteholders collectively and/or to the Trustee as their representative.

Trust indentures usually give the indenture trustee the exclusive power to enforce remedial provisions if a default occurs, and a "no-action" clause prohibits bondholders from instituting judicial proceedings against an obligor unless they first follow a series of steps set out in the trust indenture, e.g., notifying the trustee in writing of their complaints, requesting that the trustee pursue the claims, providing the trustee with a period of time to follow up on their request, and receiving a refusal from that trustee. The reason behind such clauses is to avoid a multiplicity of lawsuits and to make certain that any recovery goes for the equal and ratable benefit of all the bondholders. *See Watts v. Missouri-Kansas-Texas R. Co.*, 383 F.2d 571, 573-75 (5th Cir. 1967); *Friedman v. Chesapeake & O.R. Co.*, 395 F.2d 663 (2d Cir. 1968). Courts have held that no-action clauses apply to fraudulent conveyance claims. *See, e.g., Feldbaum v. McRory Corp.*, Civ. A. No. 11866, 1992 WL 119095, *8 (Del. Ch. June 2, 1992)("The [fraudulent conveyance] claims allegedly arise from transactions by issuers of their bonds and assert injuries arising from the bondholder status of plaintiffs. If plaintiffs have been legally injured by the transactions complained of, they are hurt derivatively. They can allege no harm different from that suffered by their fellow bondholder and

-30-

thus they should share any remedy they receive on a *pari passu* basis with other bondholders."); *Lange v. Citibank, N.A.,* No. Civ. A 19245-NC, 2002 WL 20005728, *6-7 & n.18 (Del. Ch. 2002)(applying reasoning and holding of *Feldbaum*); *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 859 F. Supp. 743, 749 (S.D.N.Y. 1994)(debenture holders barred from bringing state common law claims for fraudulent conveyance and breach of contract against issuer and related parties under no action clause in trust indenture), *aff'd in part, rev'd in part on other grounds*, 65 F.3d 1044, 1051 (2d Cir. 1995)(noting with approval that "[i]n this case plaintiffs failed to comply with the no-action clause, and, as a result, the district court rules that their state-law claims were barred."), *cert. denied*, 517 U.S. 1190 (1996); *Victor v. Riklis*, No. 91 Civ. 2897, 1992 WL 122911, *6 (S.D.N.Y. May 15, 1992); *Ernst v. Film Prod. Co.*, 148 Misc. 62, 63, 264 N.Y.S. 227, 228 (N.Y. Supr. 1933)(failure to make demand on trustee in accordance with no-action clause barred bondholders' fraudulent conveyance claim). No-action clauses are strictly construed. *Cruden*, 957 F.2d at 968; *McMahan*, 65 F.3d at 1050-51; *Watts*, 383 F.2d at 575 ("Being restrictive of the common law rights of creditors, they are to be strictly construed.").

A significant exception to a no-action clause is the bondholder's/noteholder's individual right to sue for payment of principal and interest on or after the due dates set out in his

bond/note.[25]  *See, e.g., Great Plains Trust Co. v. Union Pacific Railroad Co.*, 492 F.3d 986, 991 (8th Cir. 2007); *Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992); *In re Envirodyne Indus., Inc.*, 174 B.R. N.D. Ill. 1994); *UPIC & Co. v. Kinder-Care Learning Centers, Inc.*, 793 F. Supp. 448 (S.D.N.Y. 1992); Kahan, 77 New York University Law Review at 1071.  Section 316(b) of the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. § 77ppp(b)(2000),[26] as

_____

[25] Another exception to compliance with the conditions precedent in a no-action clause is where the bondholders allege misconduct by the trustee.  *See, e.g., Feldbaum*, 1992 WL 119095 at *7 ("[B]ondholders will be excused from compliance with a no-action provision where they allege specific facts which if true establish that the trustee itself has breached its duty under the indenture or is incapable of disinterestedly performing that duty."); *Cruden*, 957 F.2d at 968 (finding no-action clause inapplicable where plaintiffs alleged breach of the Trust Indenture Act and the Indentures against the Trustees); *Metro West Asset Mgmt., LLC v. Magnus Funding Ltd.*, No. 03 Civ. 5539, 2004 WL 1444868, *5 & n.4 (S.D.N.Y. June 25, 2004)(*citing Feldbaum*); *In re Oakwood Homes Corp.*, No. 02-13396 (PJW), 2004 WL 2126514, *3 (Bankr. D. Del. Sept. 22, 2004)(same).  No wrongdoing is alleged against the Trustee here.

[26] Section 316(b) provides,

> Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder, except as to a postponement of an interest payment consented to in paragraph (2) of subsection (a) of this section, and except that such indenture may contain a provision limiting or denying the right of any such holder to institute any such suit, if and to the extent that the institution or prosecution thereof or the entry of the judgment therein would, under applicable law result in the

-32-

amended in 1990, Pub. L. 101-550, § 415(1)-(3), codified in §
318(c), which governs indentures "qualified" under the TIA for
publicly held debt securities, protects each
bondholder's/noteholder's individual rights to collect principal
and interest when due and to institute suit without needing to
join other bondholders in a collective action.  See generally
George W. Shuster, Jr., *The Trust Indenture Act and International
Debt Restructurings*, 14 Am. Bankr. Inst. L. Rev. 431, 431-35
(Winter 2006).   Although most qualified indentures contain
parallel language to section 316(b) (though the one at issue here
does not), regardless, § 316(b) *inter alia* effectively is implied
in the indenture.[27]   In addition, if language in the indenture is
different from that in § 316(b), the language of § 316(b) governs.
George W. Shuster, Jr., *The Trust Indenture Act and International
Debt Restructurings*, 14 Am. Bankr. Inst. L. Rev. 431, 432 (Winter
2006).   A number of courts have reasoned that § 316(b), in
granting "the absolute right to sue for unpaid interest without
having to first comply with the no-action clause," "'is mandatory
in order to assure the negotiability of the debentures by making
certain that the promise to pay contained therein was
unconditional.'"  *Great Plains Trust Co.*, 492 F.3d at 991, *citing
Envirodyne*, 174 B.R. at 993, and *Watts v. Missouri-Kansas-Texas*

_____

surrender, impairment, waiver, or loss of the
lien of such indenture upon any property
subject to such lien.

[27] *See* 15 U.S.C. § 77ppp(a), stating that provisions are
automatically included in qualified indentures.

-33-

*R.R. Co.*, 383 F.2d 571, 578 (5th Cir. 1967)("[N]egotiability . .
. is reduced when no-action clauses are construed to limit suits
upon interest obligations.").

### IV. Citibank Defendants' Motion to Dismiss Counts III-VII

The Vanguard Plaintiffs were investors in the Yosemite
Securities Trust ("the Trust"), which issued the Yosemite Notes
linked to the credit of Enron.  Citibank Defendants point out that
the Trust, itself, on behalf of all Yosemite Noteholders, brought
suit against Citibank Defendants and Delta, alleging virtually the
same claims that are asserted by the Vanguard Plaintiffs here.
*Yosemite Securities Trust I, et al., v. Citibank, N.A., et al.*,
currently designated H-05-1191 and pending on the docket of the
undersigned judge.   Although the Vanguard Plaintiffs were
originally part of that action, Citibank Defendants state, "The
Trust, cooperating with Plaintiffs here, subsequently filed an
amended complaint[28] purporting to exclude Plaintiffs from the
Noteholders on whose behalf it sued."   #60 at 2 n.1, 7.[29]

_____

[28] The First Amended Complaint of *Yosemite Securities Trust I*
is filed in this action as Exhibit B to #63; it is #160 in H-05-
1191.  That action was originally filed in the Supreme Court of the
State of New York, New York County, on August 23, 2004.   It was
removed to the United States District Court for the Southern
District of New York, pursuant to 28 U.S.C. § 1334 and § 1452 on
"related to" bankruptcy jurisdiction, and was subsequently
transferred to this Court by the Judicial Panel on Multidistrict
Litigation for inclusion in MDL-1446.

[29] Instead of the pursuit of claims on behalf of all the
Noteholders as in the original complaint, the First Amended
Complaint states that the Trust pursues claims only on behalf "of
all Noteholders other than plaintiffs" in H-03-5808 and "other
current Noteholders (if any) who have released their claims against
Citibank."

Defendants maintain that case law construing Federal Rule of Civil Procedure 19 requires that all investors in a trust to be joined as indispensable parties in any lawsuit that attempts to recover trust assets; the Vanguard Plaintiffs have not joined any of the other Noteholders, who are joint obligees.  Citibank Defendants claim that Plaintiffs represent only about 7% of the Yosemite Noteholders, while the other 93% are indispensable parties.  Unless the Indenture Trustee brings suit on behalf of all the Yosemite Noteholders, Counts V and the remaining portion of VII cannot be adjudicated without joinder of that 93% because it is established law that (1) in an action by a beneficiary to restore assets allegedly dissipated or misappropriated from the trust corpus, all other beneficiaries must be joined; and (2) that noteholders have only a derivative right, shared with all other noteholders of the same series, to the assets of an indenture trust that secure payment of their notes.  *Janney Montgomery Scott*, 11 F.3d at 408 ("Joint obligees . . . usually have been held indispensable parties and their nonjoinder has led to a dismissal of the action."); *Tick v. Cohen*, 787 F.2d 1490, 1494 (11th Cir. 1986)(ordering trial court to dismiss action based on "general rule" that all beneficiaries are needed for just adjudication of an action to remove trustees and require an accounting or restoration of trust assets."); *Warner v. First Nat'l Bank of Minneapolis*, 236 F.2d 853, 857 (8th Cir. 1956)(in an action to recover dissipated trust assets, unless brought by the trustee or other entity that can act on behalf of all

-35-

beneficiaries, "all beneficiaries of the trust[] are indispensable parties."). Otherwise, in the absence of any of the noteholders, a defendant would face the possibility of multiple or inconsistent obligations. In light of Plaintiffs' withdrawal of several Counts, Citibank Defendants' motion now urges that dismissal of Count V (for unjust enrichment) is warranted because the separate suit brought by the Trust, alleging on behalf of the Trust virtually the same claim, is a more efficient and reasonable way to protect the rights of all the Noteholders.

Furthermore, because noteholders have only a derivative interest with all the other noteholders in their series in the collateral that secures the payment of the notes, any recovery of assets for the Trust must be distributed ratably to all the Noteholders, all of which are beneficiaries of the Trust. *Feldbaum v. McRory Corp.*, Civ. A. No. 11866, 1992 WL 119095, *8 (Del. Ch. June 2, 1992)("The [fraudulent conveyance] claims allegedly arise from transactions by issuers of their bonds and assert injuries arising from the bondholder status of plaintiffs. If plaintiffs have been legally injured by the transactions complained of, they are hurt derivatively. They can allege no harm different from that suffered by their fellow bondholder and thus they should share any remedy they receive on a *pari passu* basis with other bondholders.").[30]   The Indenture, itself, also

---

[30] The Court observes that Plaintiffs' claim of unjust enrichment rests on all factual allegations regarding Citibank Defendants' alleged misconduct, its scheme to defraud, in obtaining the assets the Trust without compensating the Trust with reasonable value. Such conduct includes the claimed fraudulent transfers.

provides that all distributions to the Noteholders must be made ratably.  Hurwitz Decl. (#61), Ex. A, Indenture, § 501[31]; see also §§ 13.03 (trust assets hold "for the benefit, security and protection of all Noteholders of the same series with respect to the payment of all amounts payable to such Noteholders . . . .") and 14.10 (each Noteholder covenants not to enforce rights except "for the common benefit of all Noteholders").  Defendants accuse Plaintiffs of trying to gain advantage over the other Yosemite Noteholders.[32]

_____

[31] Defendants provide a copy of the Indenture and a Collateral Security Agreement ("CSA"), Ex. A and B to #61, the Declaration of Jonathan H. Hurwitz, which govern the Yosemite Note purchasers. The Yosemite Notes Offering Memorandum, which the Plaintiffs quote at length in their complaint, describes the Indenture and the CSA and incorporates them by reference.  The Indenture and the CSA name the United States Trust Company (and subsequently the Bank of New York) as Indenture Trustee and Collateral Agent with regard to the Yosemite Trust.  Ex. A at 1; Ex. B at § 2.7.  Defendants claim that under the Indenture the Trustee is responsible for securing the rights of all Noteholders (§ 13.03), but the Court does not find such authorization at this cited point.

[32] Defendants cite *Citizens Banking Co. v. Monticello State Bank*, 143 F.2d 261, 264 (9th Cir. 1944)(in suit to restore a trust fund wrongfully dissipated by a trustee, the appellate court opined, "The purpose of this action is to protect a single trust fund in which no noteholder has a particular or separate interest but in which the interest is common and undivided with rights only of pro rata participation."); *Jett v. Merchants and Planters Bank*, 228 F.2d 156, 159 (4th Cir. 1955)("when lawyers were employed by a few out of a class of bondholders holding similar bonds of a bankrupt corporation[,] [t]hen *any money* recovered by these lawyers would accrue ratable to all members of the class holding similar bonds"); *The 2416 Corporation v. Bd. of Trustees of Univ. of Illinois*, 568 N.E. 276, 282 (Ill. App. 1991)(courts have consistently "rejected the position that bondholders could be paid on a first come, first serve basis when the collected funds would not be sufficient to pay all bondholders" and have instead "held that all  holders of past-due special assessment bonds had equal rights in the collateral and were entitled to pro rata distribution from them.").

Defendants maintain that the vast number of Yosemite
Noteholders makes joinder unfeasible here.  They contend, "The
only way to protect all Noteholders' joint interests is to seek
to vindicate the rights of all Noteholders in one suit advancing
claims on behalf of all Noteholders.  The Trust itself could bring
this action."  #60 at 13.  Defendants urge the Court to dismiss
Count V under Rule 12(b)(7) for failure to join indispensable
parties under Rule 19.

As an additional basis for dismissal, urge Citibank
Defendants, Count V should be dismissed for failure to state a
claim under Rule 12(b)(6).  They maintain that even if all the
Noteholders had been properly joined in this suit, Plaintiffs have
not alleged that they have complied with the standard "no action"
clause in the Indenture (Ex. A to #61, § 14.10), which limits the
right of the Noteholders to institute suit by requiring that the
Noteholders *inter alia* first make a demand on the Indenture
Trustee before bringing an action themselves:

> No Noteholder shall have any right by virtue
> or by availing itself of any provisions of
> this Indenture to institute any suit, action
> or proceeding in equity or at law upon or
> under or with respect to this Indenture,
> unless such Noteholder previously shall have
> given to the Indenture Trustee a written
> notice of an Indenture Event of Default and
> of the continuance thereof, as hereinbefore
> provided, and unless the Majority Noteholders
> previously shall have made written request
> upon the Indenture Trustee to institute such
> action, suit or proceeding in its own name as
> Indenture Trustee hereunder and shall have
> offered to the Indenture Trustee such
> reasonable security or indemnity (including
> reasonable advances) as it may require
> against the costs, expenses, and liabilities

-38-

to be incurred therein or thereby, and the
Indenture Trustee, for 10 Business Days after
receipt of such notice, request and offer of
security or indemnity, shall have neglected
or refused to institute any such action, suit
or proceeding; it being understood and
intended, and being expressly covenanted by
each Noteholder with the other Noteholder and
the Indenture Trustee, that no one or more
Noteholders of Notes shall have any right in
any manner whatever by virtue or by availing
itself or themselves of any provisions of
this Indenture to affect, disturb or
prejudice the rights of the Noteholders of
any other of the Notes, or to obtain or seek
to obtain priority over or preference to any
other such Noteholder or to enforce any right
under this Indenture, except in the manner
herein provided and for the common benefit of
all Noteholders. . . .

The Fifth Circuit has found that the purpose of "no
action" clauses is to prevent this kind of lawsuit to obtain
special benefits for a small minority of all debt holders. *Watts
v. Missouri-Kansas-Texas R. Co.*, 383 F.2d 571, 575 n.7 (5th Cir.
1967)(*quoting Birn v. Childs Co.*, 37 N.Y.S.2d 689, 696 (N.Y. Sup.
1942)("'Insofar as [no action clauses] prevent individual
debenture holders from getting special advantages for themselves
and protect the rights and security of all holders as a class, and
also insofar as they afford the trustee notice and an opportunity
for examination, they serve a highly useful purpose and have been
uniformly sustained . . . .'"). *See also Feldbaum*, 1992 WL 119095
at *6 and n.11 (No action clauses "ensure that the proceeds of any
litigation actually prosecuted will be shared ratably by all
bondholders" and "are thus consistent with, if not central to, the
indentures in which they are found, for the purpose of such
indentures is to centralize enforcement powers by vesting legal

-39-

title to the securities in one trustee.").[33]  Where noteholders sue
to enforce obligations owed to noteholders as a whole under a
trust indenture, they must "plead and prove compliance with the
requirements and performance of the conditions defined in the
indenture as conditions precedent to the maintenance of the
action." *Friedman v. Chesapeake and Ohio R. Co.*, 261 F. Supp.
728, 730 (S.D.N.Y. 1966).  Here Vanguard Plaintiffs have not
alleged that they made a demand on the indenture trustee as
required by the no action clause before filing suit.  Defendants
insist that the Vanguard Plaintiffs' derivative claim of
fraudulent conveyance or transfer of the trust assets[34] that would
have paid the noteholders on their notes had to be brought in
compliance with the no action clause.[35]

---

[33] The *Feldbaum* court points out that no-action clauses benefit
both bond or note issuers and investors; they help to screen out
unmeritorious or strike suits because they make it difficult for
individual holders to bring suits that are unpopular with the other
bond or note holders that would cause unjustifiable expense to the
issuer and ensure that the proceeds of any litigation will be
shared ratably by all holders.  *Id*. at *5-6.  Courts have long
recognized exceptions to the no-action clauses where misconduct by
the trustee is alleged.  *Id*. at *7.

[34] The fraud allegations feed into Plaintiffs' *quantum meruit*
claim for unjust enrichment, which recovery must also be split *pro
rata*.

[35] Citibank Defendants cite *inter alia Murray v. U.S. Bank
Trust Nat'l Ass'n*, 365 F.3d 1284 (11th Cir. 2004)(dismissing suit
for failure to comply with no action clause); *Ernst v. Film Prod.
Co.*, 148 Misc. 62, 63, 264 N.Y.S. 227, 228 (N.Y. Supr.
1933)(failure to make demand on trustee in accordance with no-
action clause barred bondholders' fraudulent conveyance claim);
*McMahan & Co. v. Wherehouse Entertainment, Inc.*, 859 F. Supp. 743,
749 (S.D.N.Y. 1994)(debenture holders barred from bringing state
law claims for fraudulent conveyance and breach of contract against
issuer and related parties under no action clause in trust
indenture), *aff'd in part, rev'd in part*, 65 F.3d 1044, 1051 (2d

### V.  Plaintiffs' Opposition

The Vanguard Plaintiffs argue that Rule 19 applies only where the absent parties are "necessary" because (1) their rights might be affected by the outcome of the pending action or (2) their absence might bar complete relief or subject the defendant to "double, multiple or otherwise inconsistent obligations by reason of the claimed interest."  Fed. R. Civ. P. 19(a)(2)(ii). Rule 19(a)(2)(I) and (ii), identifying a necessary party, do not apply here, but only where the person whose joinder is sought "claims an interest relating to the subject of the action." Plaintiffs assert that such is not the case here because the Yosemite Noteholders who did not "opt out" of *Newby* have settled with Citibank, while those who did opt out are Plaintiffs in H-05-1191, are pursuing their own claims based on their own Notes, and do not object to the Vanguard Plaintiffs' pursuit of this action.[36]

_____

Cir. 1995)(noting with approval that "[i]n this case plaintiffs failed to comply with the no-action clause, and, as a result, the district court rules that their state-law claims were barred."), *cert. denied*, 517 U.S. 1190 (1996).

Vanguard Plaintiffs, insisting these cases are inapposite, point out that in *McMahan*, there was no right to payment, as the bonds would not mature until 2006; therefore the plaintiff could not bring an individual suit for overdue principal and interest.  *Id.* at 748.  *Murray* is not clear about the due date of the bonds, but, unlike here, the trustee brought suit on behalf of all the noteholders.  In *Ernst*, the court found that a suit seeking appointment of a receiver was barred by the no-action clause because "the nature of their action shows that they are presuming to speak for all bondholders, and not for themselves alone."  148 Misc. at 63.  But the court further stated, "As creditors they have a perfect right on their own behalf to bring an action to collect the amount of their debt, ignoring the provisions of the collateral indenture."

[36] In the First Amended Complaint (#160 at ¶ 231 in H-05-1191), Plaintiffs stated,

Declaration of James M. Wines (#63), Ex. A.   The   Vanguard
Plaintiffs and Plaintiffs in H-05-1191, in their separate actions,
each seek only what is owed to them; thus a simple money judgment
in this suit will constitute complete relief to the Vanguard
Plaintiffs.   Therefore "complete relief" for both Vanguard Funds
and Defendants as to the Vanguard Plaintiffs' claims is available
in this suit without joinder of the other Noteholders.
Furthermore the disposition of this action would not impair or
impede the ability of the other Noteholders to protect their own
interests.

        Nor,   insist   Plaintiffs,   is   there   any   risk   that
Defendants will be exposed to multiple or inconsistent obligations
as that term is defined for Rule 19 purposes.   Plaintiffs quote
from *Delgado v. Plaza Las Americas, Inc.*, 139 F.3d 1, 3 (1st Cir.
1998):[37]

_____

            The Indenture Trustee is empowered to pursue
            Claims six and fourteen set forth below on
            behalf of all Noteholders of each of the
            Trusts pursuant to Sections 8.04 and 10.01 of
            each of the Indentures.   The Indenture Trustee
            pursues   these   Claims   on   behalf   of   all
            Noteholders   other   than   plaintiffs   in   the
            action entitled *Vanguard Balance Index Fund v.
            Citibank*, S.D. Tex. Case No. 03 cv 05808 and
            other current Noteholders (if any) who have
            released their claims against Citibank.

[37] *See also Immobiliaria Axial, S.A. de C.V. v. Robles Intern.
Services, Inc.*, No. EP-07-CA-00269KC, 2007 WL 2973483, *6 (W.D.
Tex. 2007)(relying on *Delgado*'s distinction between inconsistent
obligations and inconsistent adjudications or results).   *In accord.
e.g., Nelligan ex rel. Estate of Proira v. Community General Hosp.
of Sullivant County*, 240 F.R.D. 123, 125 (S.D.N.Y. 2007); *Travelers
Indemn. Co. of Connecticut v. Losco Group, Inc.*, 150 F. Supp. 2d
556, 564-65 (S.D.N.Y. 2001); *Southern Co. Energy Marketing, LP v.
Virginia Elec. and Power Co.*, 190 F.R.D. 182, 186 & n.3 (E.D. Va.

"Inconsistent obligations" [for purposes of
Rule 19] are not, however, the same as
inconsistent adjudications or results.
Inconsistent obligations occur when a party
is unable to comply with one court's order
without breaching another court's concerning
the same incident.    Inconsistent
adjudications or results, by contrast, occur
when a defendant successfully defends a claim
in one forum, yet loses on another claim
arising from the same incident in another
forum.    Unlike a risk of inconsistent
obligations, a risk that a defendant who has
successfully defended against a party may be
found liable to another party in a subsequent
action arising from the same incident,--
i.e., a risk of inconsistent adjudications or
results--does not necessitate joinder of all
of the parties into one action pursuant to
Fed. R Civ. P. 19(a).   Moreover, where two
suits arising from the same incident involve
different causes of action, defendants are
not faced with the potential for double
liability because separate suits have
different consequences and different measures
of damages.   [citations omitted]

Thus the other Noteholders are not necessary parties here, insist

Plaintiffs.

Even if the Court concludes that the other Noteholders

are necessary parties, urge the Vanguard Plaintiffs, allowing this

action to go forward would satisfy the "in equity and good

conscience" standard because as original purchasers, the Vanguard

Funds are distinctly positioned from the remaining Noteholders,

who agree with Vanguard Plaintiffs that the two sets of claims

should be tried separately.   They argue that all of the four

factors to be considered under Rule 19(b) work against dismissal

here.   The other Noteholders will not be prejudiced by a judgment

---

1999); *Fisherman's Harvest, Inc. v. U.S.*, 74 Fed. Cl. 681, 688
(Fed. Cl. 2006).

in this suit because collateral estoppel rules could benefit them
if Vanguard Plaintiffs prevail, while a judgment against Vanguard
Plaintiffs would not prejudice them because they are not in
privity with the Vanguard Funds.  Nor is there a limited fund from
which Vanguard Funds and the other Noteholders seek to recover;
Citibank can satisfy both judgments.  Thus there would be no need
to tailor any judgment Vanguard Plaintiffs might obtain to protect
the other Noteholders.  *New England Mut. Life Ins. Co. v.
Brandenburg*, 8 F.R.D. 151, 154 (S.D.N.Y. 1948)("most frequently
there must be a single fund or res involved before a court will
rule that there are indispensable parties").  Finally any judgment
in this action will not lead to recovery from, prejudice to, or
action by any absentee party.

        Challenging Defendants' characterization of Plaintiffs
as joint beneficiaries of the Trust, joint obligees, and
indispensable parties, Plaintiffs insist they are not suing to
restore trust assets.  Vanguard Plaintiffs argue that Citibank
Defendants' contention that there is a blanket rule that joint
obligees are always indispensable parties and that beneficiaries
of a trust in a lawsuit are prototypical examples is inapposite.
They insist that the Certificate Holders are the beneficiaries of
the Trust, as reflected in the Offering Memorandum, Hurwitz
Declaration (#61), Ex. C at 40:

> The beneficial ownership interests of the
> trust are evidenced by the $75,000,000 amount
> of Certificates issued in accordance with the
> terms and provisions of the trust Agreement.
> The Certificates represent 100% of the
> beneficial ownership interests.

-44-

The Vanguard Funds, instead, are **creditors** of the Trust:  they hold its notes.   Their lawsuit seeks a money judgment from Defendants.   The cases cited by Defendants deal with trust beneficiaries, not noteholders or other creditors.  The rule that all beneficiaries must be joined in a suit to restore trust assets has no application here, where creditors seek to recover money individually for themselves.   Furthermore that rule that joint obligees are indispensable parties is not "ironclad"; if it ever existed, the current version of Rule 19 overturns it.   "Under the pre-1966 version of Rule 19 many courts were concerned only with finding precedent for labeling an interest 'joint' or 'separable,' but the amendment of the rule encourages the courts to deemphasize these labels and look to considerations of policy and pragmatism." 7 Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure 3d* § 1618 (2006).   Since the adoption of the current Rule 19, there have been many cases allowing suit by fewer than all beneficiaries of a trust.  *See, e.g., Tankersley v. Albright*, 80 F.R.D. 441, 445-46 (N.D. Ill. 1978); *Rippey v. Denver U.S. Nat'l Bank*, 260 F. Supp. 704 (D. Colo. 1966).

Defendants' reliance on the no-action clause of the Indenture as a defense to Plaintiffs' claims against them is also inapposite, since neither Defendant Citibank, Salmon Smith Barney nor Delta is a party to, nor a third-party beneficiary of, that Indenture or contract[38]; the Indenture provides that it is for the

---

[38] Just as only a party to a contract can sue on the contract, "as a general rule a defense based on the terms of a contract may

sole benefit of the Indenture Trustee, the Trust and the Noteholders, and not for the benefit of any other parties. Indenture § 14.09 at 45, Ex. A to #61.  The no-action clause states that it may be enforced by "each and every Noteholder and the Indenture Trustee," but does not mention other persons.  The intent of the contracting parties governs who is a third-party beneficiary. *September Publ'g, V.B. v. Stein & Day, Inc.*, 884 F.2d 675, 679 (2d Cir, 1989). As strangers to the contract, Defendants cannot rely on it as a defense.  In addition, those for whose benefit the Indenture was expressly made (the Trust, the Indenture Trustee (speaking for the issuing Trust), and the other Noteholders have clearly stated that they have no objection to the Vanguard Plaintiffs' suit.   Wines Decl. (#63), Exs. A and B. Defendants should not be allowed to enforce the Indenture against the wishes of the express beneficiaries.

Not only do Defendants lack standing to invoke the no-action clause of the Indenture, but the clause does not bar this action anyway, insist Plaintiffs.   Courts have concluded that where a noteholder has not been paid principal and interest, as here, the noteholder may pursue an individual remedy.  The Fifth Circuit, in a case cited by Defendants, has held that no-action clauses must be strictly construed and do not apply where the plaintiff  seeks to recover interest and principal on overdue, unpaid notes. *Watts v. Missouri-Kansas-Texas R.R. Co.*, 383 F.2d

be asserted only by a party thereto who urges it in his own defense." *Nahmias Realty, Inc. v. Cohen*, 484 N.E. 2d 617, 623 (Ind. Ct. App. 1985).

-46-

at 575 (quoting *Noble v. European Mortgage & Inv. Corp.*, 165 A. 157 (Del. Ch. 1933))(reasoning that no-action clauses are "restrictive of the common law rights of creditors" and therefore "are to be strictly construed" and "are not to be extended by implication."). The appellate court concluded that where the notes are unpaid, the action is on the note (the debt), and not under the Indenture. *Id.* ("The complainants are creditors, therefore, who possess a right to enforce immediate payment of coupons overdue without recourse to the trustee."). Thus no-action clauses "do not restrict suits by individual bondholders for interest or principal due and owing." *Id.* at 574. *See also Ernst v. Film Prod. Corp.*, 148 Misc. 62 (N.Y. Sup. Ct. 1933)("As creditors they have a perfect right on their own behalf to bring an action to collect the amount of their debt, ignoring the provisions of the collateral indenture. In connection with this action they may even invoke the auxiliary remedies provided by the Debtor and Creditor law [the New York fraudulent transfer statute]."); *Feldbaum*, 1992 WL 119095 at *1 ("claims for past due principal and interest escape the barring effect of the no-action clause."). Vanguard Plaintiffs maintain that here they sue on their own behalf, on their own debt, and may invoke the fraudulent transfer remedies to pursue funds fraudulently transferred from the Trust.

Plaintiffs argue that judicial economy will not be served by dismissal of this action because Plaintiffs, who bought their notes in the original offering, are in "a dramatically

different position" from the other Noteholders, who purchased subsequently.  Only original purchasers have claims under the Pennsylvania blue sky laws, a factor which Defendants do not even address in their motion to dismiss for failure to join indispensable parties.  Furthermore, presumably the other Noteholders purchased their Notes at substantial discount from face value.

Plaintiffs' fraud claims under Pennsylvania law (Counts I-II) [and the first part of Count VII] are not challenged and thus the Plaintiff Vanguard Funds should not be deprived of their chosen forum for those claims, urge Plaintiffs.

### VI.  Citibank Defendants' Reply

Citibank Defendants insist that both of the criteria of Rule 19(a), presented in the disjunctive so that joinder is appropriate if either condition is met, are satisfied here.

First, complete relief cannot be provided to the existing parties because any judgment in this suit would require a distribution to all of the Noteholders with outstanding claims on a pro rata basis, which cannot be achieved in the absence of some of the Noteholders.  What Vanguard Plaintiffs are actually seeking under Count VII of the complaint is not recovery of principal and interest payments, but rescission of contracts underlying the Yosemite offering by declaring the transactions involved fraudulent transfers.  Count V seeks relief on claims concerning transactions that relate to the Yosemite offering as a whole, not to specific transactions with Vanguard. Both Counts

implicate interests of all other Noteholders besides the Vanguard Funds. Citibank further insists that the Trustee and the other Noteholders pursue the same theories of recovery as the Vanguard Plaintiffs and they apply equally to all Noteholders and/or the Trust. Complaint at ¶¶ 306-57.[39]  In contrast in *Delgado*, 139 F.3d at 3, the court noted that the different plaintiffs in different cases had "separate causes of action based on different theories of recovery," unlike the Trustee and the Vanguard Plaintiffs in Counts V and VII in the instant action. Moreover these Counts apply equally to all Yosemite Noteholders. Count V's claim of unjust enrichment of Citibank states that Citigroup "intentionally misled purchasers of Yosemite Notes, including Vanguard Funds" (¶ 342) and rests on the fraudulent transfers of all assets of the Trust. Count VII sets forth allegations of conspiracy to commit the fraudulent transfers.

Second, the absent parties would be prejudiced if this action went forward. In *Pulitzer-Polster v. Pulitzer,* 784 F.2d 1305, 1311-12 (5th Cir. 1984), in which there were parallel federal and state court actions, the Fifth Circuit held that even though a complaint brought in federal court was "carefully phrased to

---

[39] As examples of Vanguard Plaintiffs' claims that apply equally to all Yosemite Noteholders, Citibank points to Count III ¶ 318, which asserts that the alleged fraudulent transfer defrauded "the Yosemite Noteholders, including the Vanguard Funds."  Count IV ¶¶ 332-35 asserts that due to the constructive fraudulent transfer, the Trust was rendered insolvent, causing it to default on its obligations to Noteholders.    Count V, relating to unjust enrichment, states that Citigroup "intentionally misled purchasers of the Yosemite Notes, including the Vanguard Funds."  Count VI lists ways in which the Trust was allegedly Citibank's alter ego.

seek damages only for [that plaintiff]," because the claims were identical in substance to those of a parallel state action, the federal suit might "create precedent that the [state] court would recognize as a practical matter."  Citibank insists Counts V and VII here are "identical in substance" to claims made in the action brought by the Trust and the remaining Noteholders and that a decision adverse to Vanguard Plaintiffs would create precedent that might persuade the judge and prejudice the claims of the other Noteholders in H-05-1191.  *See also Spiro v. Parker Brothers*, No. 91 Civ. 7759, 1992 WL 197405, *1 (S.D.N.Y. Aug. 4, 1992)(although minority owners stated they were not interested in joining the litigation and failed to intervene, the court held their failure to intervene did not demonstrate that they lacked an interest that could be prejudiced and that therefore continuing the suit without joining them would violate Rule 19).

Rule 19 furthers not only the interests of the parties, "but also that of the public in avoiding repeated lawsuits on the same essential subject matter."  Fed. R. Civ. P. 19 Advisory Committee's Notes on The Amended Rule.  *Faunce v. Bird*, 210 F.R.D. 725, 730 (D. Or. 2002)(The public also has an interest "in avoiding repeated lawsuits on essentially the same subject matter."); *Pulitzer*, 784 F.2d at 1313 ("The presence of multiple litigation and its attendant burdens on the parties and the court system should also be considered.").  Here, the public's interest supports dismissal of Counts V.

-50-

Although Plaintiffs argue that Citigroup should not be allowed to enforce the no-action clause because it is not a party to the Indenture nor a third-party beneficiary of it, Citibank Defendants point out that courts have allowed non-parties to enforce such clauses. *Lange v. Citibank, N.A.,* No. Civ. A 19245-NC, 2002 WL 20005728 (Del. Ch. 2002); *Feldbaum*, 1992 WL 119095. This Court agrees.

Challenging Plaintiffs' contention that they are not barred by the no-action clause and can sue individually to recover interest and principal of their overdue, unpaid notes, Citibank Defendants argue that the problem is the same one that permeates Counts III-VII, i.e., Vanguard's right to recover unpaid interest and principal on the Notes is a right that it holds against the Trust, not against Citigroup.  In cases cited by Plaintiffs, the noteholder sued the issuer, not a third party purportedly involved in the transaction or a claimed alter ego of the issuer.  *See, e.g., Watts*, 383 F.2d at 572 (debenture holders sued the issuer, a railroad company).  The no-action clause was designed to consolidate such claims as Vanguard Plaintiffs' against Citigroup into a single action brought by the Trustee on behalf of all the Noteholders.

Furthermore, Defendants argue, Vanguard Plaintiffs did not plead Count V as a claim for payment on overdue notes, but instead for unjust enrichment, effected by their scheme to defraud, including in part fraudulent conveyances.  Courts have enforced no-action clauses in actions in which the plaintiffs sue

defendants other than the issuers of the debentures (i.e., companies related to the issuer alleged to have engaged in fraudulent transactions with the issuer) under theories of fraudulent conveyance. *See, e.g., Feldbaum*, 1992 WL 119095 (finding the no action clauses barring all suits "with respect to" the indenture or the securities constituted waivers by plaintiffs of any right to bring suits seeking to enforce rights shared ratably by all bondholders against defendants without first satisfying the procedural requirements of those clauses). Nevertheless, the Delaware Chancery court concluded in *Feldbaum, id*. at *5, "The policy favoring the channeling of bondholder suits through trustees mandates the dismissal of individual bondholder actions no matter whom the bondholders sue." *See also McMahan*, 859 F. Supp. at 748-49 (no-action clause barred individual debenture holders' claims for fraudulent conveyance and breach of implied duty of good faith claims brought against parties affiliated with the issuer, specifically officer of the issuer, underwriter of the bonds, and issuer's parent company); *Victor v. Riklis*, No. 91 Civ. 2897, 1992 WL 122911, *6 (S.D.N.Y. May 15, 1992); *Ernst v. Film Prod. Corp.*, 148 Misc. at 63. Like the fraudulent conveyance claims, the related claim for unjust enrichment should be brought by the Trust, not by individual Noteholders.

## VII. Court's Decision

The Court finds that the threshold issue here is whether in Count V and the remaining portion of Count VII the Vanguard Plaintiffs are suing to collect on unpaid interest and principal

due on their Yosemite Notes under section 316(b) of the ITA or are their claims actually to recover trust assets dissipated by Defendants' fraudulent transfers and misappropriation of the Trust's assets, wrongs common to all Yosemite Noteholders thus subject to the no-action clause in the Indenture?

Regarding Count V for unjust enrichment Vanguard Plaintiffs seek a constructive trust "upon the funds used to repay the sham Roosevelt and Jethro prepays and other Yosemite Trust assets (and the proceeds therefrom that Citibank received as a result of the conduct alleged herein,"[40] not for unpaid interest and principal on their own notes. Return of the funds to the Trust would be distributed *pro rata* to all Noteholders that have not settled. The remaining portion of Count VII for conspiracy to violate the Pennsylvania Securities Act through misrepresentations in the Offering Memorandum[41] alleges "legal damage," for which injuries Plaintiffs pray for "damages" relating to the Yosemite Notes they no longer own, in addition to the consideration they paid and interest for the Notes they currently own. Thus they are pursuing damages for derivative claims that again affect all the Yosemite Noteholders. Moreover, resolution of these claims will require determinations of a fraudulent scheme, including misrepresentations, fraudulent transfers, and misappropriation by Citibank Defendants and Delta, which apply to all Noteholders' claims, and they seeking a recovery that must be

---

[40] Complaint at ¶ 345 and at 114.

[41] Complaint at ¶ 354 and at 114.

distributed *pro rata* under the terms of the Indenture.   As stated in *Lange*, 2002 WL 2005728 at *6-7,

> The fraudulent conveyance claims brought here . . . plainly do fall within the scope of the no-action clauses.   The claims allegedly arise from transactions by issuers of their bonds and assert injuries arising from the bondholder status of the plaintiffs.   If the plaintiffs have been legally injured by the transactions complained of, they are hurt derivatively.   They can allege no harm different from that suffered by their fellow bondholders and thus should share any remedy they receive on a *pari passu* basis with other bondholders.
> Given the derivative character of these claims, it is clear that they can be prosecuted by the trustees representing the bondholders as a group, provided the trustees are in a position in which they can represent plaintiffs fairly.

Therefore the Court concludes that for purposes of Counts V and VII, all those Yosemite Noteholders that did not settle with the Citibank Defendants are joint obligees among whom any recovery under Counts V and the damages for the remaining part of VII would have to be distributed ratably.   Most of these Noteholders are not parties to this suit.   The Trustee or all Yosemite Noteholders that have not settled with Citibank Defendants are required "parties needed for just adjudication" under Rule 19(a).   *See, e.g.,* Tick, 787 F.2d at 1494 (general rule is that all beneficiaries are needed for just adjudication of an action to . . . require . . . restoration of trust assets"); *Warner*, 236 F.2d at 857 (in an action to recover dissipated trust assets, unless brought by the trustee or other entity that can act on behalf of all beneficiaries, "all beneficiaries of the trust[] are

-54-

indispensable parties.[42]").  The other Yosemite Noteholders in H-05-1191 under the Indenture have an interest relating to the subject of the action and are so situated that the disposition of the action, H-03-5808, in their absence, may as a practical matter impair or impede the other Noteholders' ability to protect that interest under Rule 19(a)(2)(i) or make it impossible to accord all parties complete (pro rata) relief under Rule 19(a)(1). Moreover, because the transferor courts purportedly have "related to" bankruptcy jurisdiction in both suits,[43] jurisdiction would not be destroyed by the joinder of the Trustee here or by re-joinder of the Vanguard Plaintiffs in H-05-1191 (as is evidenced by their initially being named as parties in that suit).

Furthermore, procedurally joinder is feasible, either by voluntary joinder here of the Trustee representing all the Yosemite Noteholders for purposes of Count V and the remaining portion of  Count VII or by the filing and granting of a motion by Vanguard Plaintiffs to intervene in H-05-1191 and re-amendment of the pleadings in that action.  Nevertheless, because Counts V and VII are subject to the no-action clause, the Vanguard Plaintiffs, which concede they did not comply with its conditions

---

[42] Because joinder of the Trustee is feasible here, the Court does not reach analysis under Rule 19(b) to determine whether Defendants are indispensable parties.

[43] The Court is aware that there is a motion to remand pending in H-05-1191, but even if granted, the New York state court would have  subject matter and personal jurisdiction over the suit.

precedent,[44] are barred from bringing them here.[45]   Therefore they must be asserted by the Trustee, as they were originally in H-05-1191.[46]   Thus the Noteholders, themselves, have not and cannot state claims in Counts V and VI under Rule 12(b)(6).

Moreover, while Rule 19(a)(2) mandates that a required party must be made a party, even if involuntarily by court order, to join the Trustee involuntarily here in H-03-5808 would eviscerate the no-action clause.  Because of that provision, the Court finds that the Vanguard Plaintiffs, if they wish to pursue those claims, should move to intervene in H-05-1191 so the Trustee can pursue the claims in Counts V and remaining portion of VII on the Vanguard Plaintiffs' behalf.

Although the Vanguard Plaintiffs may still pursue their claims under Counts I and II here, a single action would serve a significant purpose of Rule 19, i.e., that of the supporting the public's interest "in avoiding repeated lawsuits on the same essential subject matter."   Fed. R. Civ. P. 19 Advisory Committee's Notes on The Amended Rule.  *See Faunce v. Bird*, 210 F.R.D. 725, 730 (D. Or. 2002)(The public also has an interest "in

---

[44] Nor, for that matter, have the other Noteholders.

[45] The Court is aware of the exception to the no-action clause where the Noteholders allege the Trustee is guilty of wrongdoing. There is no such allegation here, only that Citibank controlled the Trust as the Directing Party and was thus its alter ego.

[46] Even if the Vanguard Plaintiffs, as the purportedly only original purchasers of the Notes, are the only Noteholders with standing to assert claims under the Pennsylvania blue sky laws, because of the no-action clause, the Trustee alone can assert those claims on the Vanguard Plaintiffs' behalf.

avoiding repeated lawsuits on essentially the same subject matter."); *Pulitzer*, 784 F.2d at 1313 ("The presence of multiple litigation and its attendant burdens on the parties and the court system should also be considered."). Because the Trustee in H-05-1191 was cooperative in carving the Vanguard Plaintiffs out of its original suit by its First Amended Complaint, the Court assumes that the Trustee and Vanguard Plaintiffs can work out a means of properly and jointly pursuing the claims and urges the parties to do so.

Accordingly for the reasons indicated above, the Court

ORDERS that Plaintiffs' request to withdraw Counts III, IV, VI, and that portion of Count VII that relates to Defendants' alleged conspiracy to commit fraudulent transfers is GRANTED.  It further

ORDERS, pursuant to Rules 19(a) and 12(b)(6), that Citibank Defendants' motion to dismiss the Vanguard Plaintiffs' Counts V is GRANTED without prejudice to Count V's being reurged by the Trustee on behalf of all Yosemite Noteholders that have not settled with Citibank Defendants.  If the Trustee wishes to pursue Count V, it shall move to replead in H-05-1191 within twenty-one days and add that claim once again.

**SIGNED** at Houston, Texas, this 19th day of March, 2008.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

-57-